Dissenting Opinion of
Justice LEEDS:
The ruling in the Majority Opinion is contrary to the constitutional amendment requirements adopted by the Cherokee people in the 1975 Constitution. I respectfully dissent.
Article XV, Section 10 of the 1975 Constitution plainly states:
No amendment or new Constitution shall become effective without the approval of the President of the United States or his authorized representative. (emphasis added)
By adopting this provision, the Cherokee people made it clear that the 1975 Constitution could never be amended or superseded by a new constitution without the approval of the federal government. There are no exceptions.
It is not the proper role of this Court to question the wisdom of federal oversight or to find creative ways around the federal approval requirement. The sole duty of this Court is to interpret the 1975 Constitution as it is plainly written. The 1975 Constitution clearly requires federal approval for all amendments and new constitutions.
The only issue before this Court is whether the federal government approved an amendment to Article XV, Section 10 of the 1975 Constitution. This is not the first time this Court has dealt with federal approval of a constitutional amendment. In McClain v. Election Commission, JAT 98-12, this Court faced a similar question.
In 1995, the Cherokee people voted to amend the 1975 Constitution imposing a residency requirement on the offices of *68 Principal Chief and Deputy Chief Despite the fact that the Cherokee people had voted to amend the 1975 Constitution, this Court ruled in McClain, that the residency requirement could not take effect because the federal government had not approved the amendment. Federal approval for the residency requirement was finally obtained in 2002. Although the Cherokee people had to wait several years for their will to become the law, the wait was necessary because of the plain language of the 1975 Constitution. The amendment requirements of the 1975 Constitution must be taken seriously and cannot be set aside.
The words of the late Justice Keen from the McClain decision are equally fitting for the case at hand:
The Cherokee Constitution is the organic document of the Cherokee government. It must not be trifled with. Any and all amendments to the Cherokee Constitution must be made to follow the strict, long-established procedure, (emphasis added)
In the Majority Opinion, the Court seems to have ruled that when the Cherokee people voted to amend Article XV, Section 10, federal approval was not required. The Court seems to take the position that the vote instantaneously amended the 1975 Constitution. Such a ruling has no basis in law and is contrary to the plain language of the 1975 Constitution. The ruling is also contrary to this Court’s ruling in McClain.
The Majority fails to adequately address the sole question presented to this Court: whether federal approval was obtained. Instead, the Majority simply states that the “people of the Cherokee Nation by their inherent sovereign power had the right to remove the self-imposed-requirement-of Article XV, Section Ten (10) of the Cherokee Nation Constitution of 1975,” -
There is no doubt that the Cherokee people have the inherent right of self-government. The Cherokee people exercised that right when they adopted the 1975 Constitution. When the Cherokee people adopted the 1975 Constitution, they chose to subject themselves to all the provisions and requirements of the 1975 Constitution. The requirement that the federal government approve any and all constitutional amendments and new constitutions is one of those requirements the Cherokee people adopted. The requirement cannot simply be ignored.
Petitioners agree that under the 1975 Constitution, the federal government must approve all constitutional amendments. Petitioners base their entire case for federal approval on a letter dated April 23, 2002. This letter was addressed to Principal Chief Chad Smith from Mr. Neal McCaleb while he was the Assistant Secretary of the Interior. The Majority never addresses whether the McCaleb letter constitutes federal approval.
The McCaleb letter, which was written before the Cherokee people went to the polls, contains the following statement:
We have no objection to the referendum as proposed and / am prepared to approve the amendment deleting the requirement for the Federal approval of future amendments, (emphasis added)
This letter confirmed that the federal government had no objections to the language being presented to the voters and it indicates that at the time, the Department of Interior was “prepared to approve” the amendment to the 1975 Constitution if adopted by Cherokee voters.
A pre-election letter stating that a federal official is “prepared to approve” an amendment does not constitute final federal approval to satisfy Article XV, Section 10 of the 1975 Constitution. It suggests that at least one additional federal action *69 must be taken, once the election is held. There was always the possibility that the federal government’s position will change, or that the Cherokee people will reject the amendment. A federal official can be “prepared” to take certain action, and then never take such action.
When the 1975 Constitution was amended in the past, there was communication from the federal government, in no uncertain terms, that final federal approval had been obtained. When the Cherokee people voted to amend the 1975 Constitution to require the fifteen Council seats represent specific districts within the Cherokee Nation, federal approval was obtained the following year via a memorandum from the BIA area office. The approval language left no doubt:
By copy of this memorandum, we are notifying the Cherokee Nation that pursuant to Article XV of the Constitution of the Cherokee Nation of Oklahoma, the Muskogee Area Director hereby approves the action taken by the Cherokee Nation’s electorate to amend its constitution at an election held June 20, 1987. (emphasis added)
Likewise, when the Cherokee people voted to amend the 1975 Constitution to impose a residency requirement on the office of Principal Chief and Deputy Chief, the federal approval communication was unmistakably clear. The communication even included a formal “Certificate of Approval” signed by the appropriate federal official that stating:
[b]y virtue of the authority granted to the Secretary of the Interior and delegated to me 10 BIAM 3, and by Article XV, Section 10, of the Constitution of the Cherokee Nation, [I] do hereby approve the foregoing Amendment to the Constitution of the Cherokee Nation ... (emphasis added)
The McCaleb letter does not favorably compare to the previous federal approvals, in terms of finality or clarity. Being “prepared to approve” an amendment is clearly something less than final approval of an amendment. The McCaleb letter is the only evidence in this case to suggest final federal approval and it falls short.
To aid this Court’s interpretation of the McCaleb letter, Petitioners submit an affidavit from former Assistant Secretary Neal McCaleb dated April 3, 2006. In that affidavit, Mr. McCaleb states that in his 2002 letter, he “approved the proposed question for referendum vote of the Cherokee people.” He continues by stating that “it was [his] purposeful intention” that the letter serve as “full and final approval” for presentment to the Cherokee people for their final approval or rejection.
At the time Mr. McCaleb signed the affidavit, he was no longer a federal official. It is inappropriate for this Court to rely solely on the interpretative statement of a former federal official, particularly when there is no other evidence of federal approval. The McCaleb letter speaks for itself. Mr. Caleb was “prepared to approve” the amendment. Mr. Caleb never approved the amendment.
The federal government, in a correspondence provided in Petitioners pleadings, takes the position that federal approval is still forthcoming. On July 29, 2004, Regional Director of the BIA Jeanette Hanna provided to Principal Chief a letter indicating that the McCaleb letter was only a pre-referendum approval. Ms. Hanna notes that it is the regional office’s recommendation to the BIA “headquarters” that the amendment be approved. This letter, dated a full year after the Cherokee people went to . the polls, indicates the need for further federal action to approve the amendment. Although Ms. Hanna recommends that the amendment be approved, *70 she indicates that federal approval has never been obtained.
The Principal Chiefs office, although not intervening as a party to this lawsuit, responded by asking this Court for two extensions of time. He asked this Court to stay the proceedings because “negotiations are ongoing with the Bureau of Indian Affairs in Washington, D.C.” Apparently the Cherokee Nation is still in the diplomatic and political process of obtaining final federal approval for the constitutional amendment.
The legislative branch also responded to this lawsuit by stating that the Council “operates and continues to operate under the 1976 Constitution, which was the last Constitution approved by the President of the United States and/or his designee.” The Council’s response states that they have “relied on statements of the Principal Chief and members of the Cherokee Nation Constitution Commission in their statements of continually seeking approval of the Bureau of Indian ■ Affairs ratifying the amendments to the 1976 Constitution.”
The pleadings and correspondence in this case indicate that it is the understanding of the federal government, the Cherokee legislative branch, and the Cherokee executive branch that federal approval has never been obtained. Despite the tact that the Cherokee people have spoken, the amendment cannot take effect until there is federal approval. In McClain, it took several years for the will of the Cherokee people to become law. Yet in McClain, this Court properly exercised restraint and let the diplomatic and political process take its course.
It is no doubt frustrating for the Cherokee people who have voted on a constitutional amendment, or a new constitution, to wait for years and years for federal approval. It is even more frustrating in the present scenario when the Cherokee people have voted to finally free themselves of federal oversight, to once again wait several years for federal approval of that amendment. Once federal approval is obtained, the Cherokee people will be free from federal involvement. To obtain that freedom, however, the Cherokee people must faithfully follow their own laws.
The avenue for obtaining federal approval for this amendment is the diplomatic and political process between the Cherokee Nation and the United States. The Cherokee people empower their elected officials to negotiate for federal approval and to represent them in the process. The judicial branch is not empowered to declare that process void. The judicial branch must interpret the 1975 Constitution as it is plainly written:

No amendment or new Constitution shall become effective 'without the approval of the President of the United States or his authorized representative.

The result of the Majority Opinion is that both the amendment to the 1975 Constitution and the new 1999 Constitution are now effective, both without federal approval.
Although I strongly dissent to the Majority Opinion, this Court has spoken and the Cherokee government shall now operate under the 1999 Constitution. To effectuate the transition, the Judicial Appeals Tribunal is now the Supreme Court with the effective date of July 26, 2003. Article VIII of the 1999 Constitution set initial terms for the Justices which was designed to produce staggered terms, with one Justice’s term expiring on December 31st of each even year. Because there was significant delay in placing the 1999 Constitution on the ballot, two of the initial terms expired before the 1999 Constitution was ever voted on by the people. I agree with the Majority on the apportionment of the *71 Supreme Court seats. The initial terms of seats one and two expired prior to 2003.
I was confirmed as JAT Justice under the 1975 Constitution with a term to expire December 31, 2006. This timeline is consistent with Seat 4 in the 1999 Constitution and my seat will end on the last day of this year. Two additional Justices should be confirmed as soon as possible.
Justice Dowty and Matlock, however, were confirmed to this Court after the 1999 Constitution took effect. They must necessarily be serving their first term under the new Constitution. Likewise, the elected officials who were sworn-in in August 2003 took office after the effective date of the 1999 Constitution. Each must necessarily be serving their first term under the 1999 Constitution.